IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHARLES OKPOKWU, *on behalf of himself and others similarly situated*,<br><br>    Plaintiffs,<br><br>v.<br><br>RAPID TAXI COMPANY, INC.;<br>YELLOW CAB OF GEORGIA, INC.;<br>SOLOMON BEKELE; and<br>JORGO LEMMA,<br><br>    Defendants. | CIVIL ACTION FILE NO.<br><br>_____ |

## COMPLAINT

Named Plaintiff Charles Okpokwu, on behalf of himself and others similarly situated, brings this action by and through undersigned counsel, and states and alleges:

### THE ACTION

1.      This is an action for damages and other relief brought pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, ("FLSA") as a result of Defendants' willful failure to pay Named Plaintiff and others similarly situated the minimum wage as required by federal law.

## THE PARTIES

2.      Named Plaintiff is a 50-year-old Nigerian national who moved to the United States in 1980.

3.      Named Plaintiff holds a Green Card for permanent residence in the United States and resides in Atlanta, Georgia.

4.      Named Plaintiff and others similarly situated are individuals who have been employed by Defendants and have been paid as independent contractors to drive taxis during the three years prior to the filing of this lawsuit and continuing through the duration of this action ("Drivers").

5.      Rapid Taxi Company, Inc. ("Rapid Taxi") is a domestic Georgia corporation with principal offices located at 55 Milton Avenue SE, Atlanta, Georgia 30315.

6.      Rapid Taxi may be served with process by delivering a copy of the complaint and a summons to its Registered Agent, Solomon Bekele, whose address is listed with the Georgia Secretary of State as 55 Milton Avenue SE, Atlanta, Georgia 30315, or to its corporate officers.  Fed.R.Civ.P. 4(h).

7.      Yellow Cab of Georgia, Inc. ("Yellow Cab") is a domestic Georgia corporation with principal offices located at 55 Milton Avenue SE, Atlanta, Georgia 30315.

8.     Yellow Cab may be served with process by delivering a copy of the complaint and a summons to its Registered Agent, Solomon Bekele, whose address is listed with the Georgia Secretary of State as 1720 Peachtree Street, Suite 314, Atlanta, Georgia 30309, or to its corporate officers.  Fed.R.Civ.P. 4(h).

9.     Defendant Solomon Bekele ("Defendant Bekele") is the Chief Executive Officer and Chief Financial Officer of both Rapid Taxi and Yellow Cab.

10.     Defendant Bekele may be served with process personally at his home address, at the shared offices of Rapid Taxi and Yellow Cab, or wherever he may be found.  Alternatively, Defendant Bekele may be served with process by leaving a copy of the summons and complaint with someone of "suitable age and discretion" residing at his home address.  Fed.R.Civ.P. 4(h).

11.     Defendant Jorgo Lemma ("Defendant Lemma") is the Secretary of both Rapid Taxi and Yellow Cab.

12.     Defendant Lemma is the Secretary of Rapid Taxi and Yellow Cab. He may be served with process personally at his home address, at the shared offices of Rapid Taxi and Yellow Cab, or wherever he may be found. Alternatively, Defendant Lemma may be served with process by leaving a copy of the summons and complaint with someone of "suitable age and discretion" residing at his home address.  Fed.R.Civ.P. 4(h).

-3-

## JURISDICTION & VENUE

13.     The Court has jurisdiction over the claims stated herein pursuant to 28 U.S.C. § 1331.

14.     Rapid Taxi is an employer covered by the FLSA because (1) Rapid Taxi is an employer engaged in interstate commerce; (2) Rapid Taxi's employees (including Plaintiffs) engaged in interstate commerce at all times relevant to this lawsuit; and (3) Rapid Taxi has at least $500,000.00 in "annual gross volume of sales made or business done."  29 U.S.C. § 203(s)(1)(A).

15.     Yellow Cab is an employer covered by the FLSA because (1) Yellow Cab is an employer engaged in interstate commerce; (2) Yellow Cab's employees (including Plaintiffs) engaged in interstate commerce at all times relevant to this lawsuit; and (3) Yellow Cab has at least $500,000.00 in "annual gross volume of sales made or business done."  29 U.S.C. § 203(s)(1)(A).

16.     Defendant Bekele is an employer under the FLSA because he is a corporate officer with operational control over Rapid Taxi and Yellow Cab.

17.     As such, Defendant Bekele is jointly and severally liable to Named Plaintiff and others similarly situated for unpaid wages and other damages.

18.     Defendant Jorgo Lemma is an employer under the FLSA because he is a corporate officer with operational control over Rapid Taxi and Yellow Cab.

19.    As such, Defendant Jorgo Lemma is jointly and severally liable to Named Plaintiff and others similarly situated for unpaid wages and other damages.

20.    Named Plaintiff has consented in writing to be a party to this action pursuant to 29 U.S.C. § 216(b).

21.    A true and correct copy of Named Plaintiff's signed consent form is attached as Exhibit A.

22.    Other Drivers have expressed interest in joining this lawsuit.

23.    For example, John Ochei has consented in writing to be a party to this action.

24.    A true and correct copy of the consent form signed by John Ochei is attached as Exhibit B.

25.    As the case proceeds, other Drivers will likely will sign consent forms and seek to join this action.

26.    Pursuant to 28 U.S.C. § 1391 and Local Rule 3.1(B)(1)(a), venue is proper in this Court because the events giving rise to the claims of Named Plaintiff and others similarly situated occurred within the Atlanta Division of the United States District Court for the Northern District of Georgia.

## FACTS SHOWING THAT DEFENDANTS ARE JOINT EMPLOYERS

27.     Defendants Bekele and Lemma are corporate officers of Rapid Taxi and Yellow Cab.

28.     Defendant Bekele is the Chief Executive Officer and Chief Financial Officer of both Rapid Taxi and Yellow Cab.

29.     Defendant Lemma is the Secretary of both Rapid Taxi and Yellow Cab.

30.     Defendant Bekele, in his capacity as CEO and CFO of Rapid Taxi and Yellow Cab, and in his capacity as Registered Agent for Yellow Cab, maintains offices at 1720 Peachtree Street, Suite 314, Atlanta, Georgia 30309.

31.     Rapid Taxi, Yellow Cab, and Solomon Bekele, in his capacity as Registered Agent for Rapid Taxi, maintain offices at 55 Milton Avenue SE, Atlanta, Georgia 30315.

32.     On information and belief, Defendants Solomon Bekele and Jorgo Lemma jointly operate both Rapid Taxi and Yellow Cab.

33.     On information and belief, Solomon Bekele directly and indirectly controls, determines, and directs the day-to-day operations of Defendants Rapid Taxi and Yellow Cab.

34.    On information and belief, Solomon Bekele directly and indirectly determines the payroll and compensation practices for Rapid Taxi and Yellow Cab.

35.    For example, Defendant Bekele chooses to classify Drivers as independent contractors, rather than employees, for purposes of payroll.

36.    On information and belief, Solomon Bekele directly and indirectly determines the scheduling, dispatch and other employment practices for Rapid Taxi and Yellow Cab.

37.    For example, Defendant Bekele determines the method used by the dispatchers at Rapid Taxi and Yellow Cab to assign fares to each Driver.

38.    On information and belief, Solomon Bekele directly and indirectly controls the terms of insurance for cabs affiliated with Rapid Taxi and Yellow Cab.

39.    For example, Defendant Bekele requires Drivers to insure their vehicles through Captive Insurance, Inc. ("Captive Insurance"), an insurance company owned by Solomon Bekele.

40.    In the event of an accident, Solomon Bekele directly determines the extent to which Captive Insurance will pay out on a claim.

41.    Solomon Bekele has the power to hire and fire Drivers.

42.    On information and belief, Solomon Bekele maintains the employment records of Drivers.

43.     On information and belief, Jorgo Lemma directly and indirectly controls, determines, and directs the day-to-day operations of Defendants Rapid Taxi and Yellow Cab.

44.     On information and belief, Jorgo Lemma directly and indirectly determines the payroll and compensation practices for Rapid Taxi and Yellow Cab.

45.     For example, Defendant Lemma chooses to classify Drivers as independent contractors, rather than employees, for purposes of payroll.

46.     On information and belief, Jorgo Lemma directly and indirectly determines the scheduling, dispatch and other employment practices for Rapid Taxi and Yellow Cab.

47.     For example, Defendant Lemma directly or indirectly controls the method used by the dispatchers at Rapid Taxi and Yellow Cab to assign fares to each Driver.

48.     Jorgo Lemma has the power to hire and fire Drivers.

49.     On information and belief, Jorgo Lemma maintains the employment records of Drivers.

50.     Rapid Taxi and Yellow Cab are both taxi companies licensed by the Atlanta Police Department, Division of Taxicabs and Vehicles for Hire ("Bureau").

51.     In the City of Atlanta, any person operating a vehicle for hire must hold a Certificate of Public Necessity and Convenience (CPNC), which is a license permitting that person to operate one vehicle for hire in the City of Atlanta. Atlanta, Ga. Code. § 162.77(8) (2008).

52.     On information and belief, Rapid Taxi is a holder of twenty-five (25) or more CPNC's.

53.     On information and belief, Yellow Cab is a holder of twenty-five (25) or more CPNC's.

54.     On information and belief, Solomon Bekele is a holder of one or more CPNC's.

55.     On information and belief, Solomon Bekele exercises control over the assignment of CPNC's to each taxi operated by Rapid Taxi and Yellow Cab, and sets the terms of their use by Drivers.

56.     On information and belief, Jorgo Lemma exercises control over the assignment of CPNC's to each taxi operated by Rapid Taxi and Yellow Cab, and sets the terms of their use by Drivers.

57.     Defendant Bekele owns Rapid Taxi and Yellow Cab.

58.     On information and belief, Defendants Rapid Taxi, Yellow Cab, Solomon Bekele, and Jorgo Lemma are or have been joint employers for the purposes of the FLSA.

**FACTS SHOWING THAT NAMED PLAINTIFF AND OTHERS SIMILARLY SITUATED ARE DEFENDANTS' EMPLOYEES, NOT INDEPENDENT CONTRACTORS**

59.     Named Plaintiff and others similarly situated were Drivers for Defendants during the last three years prior to the filing of this complaint.

60.     At all times relevant to this action, Defendants required Drivers, including Named Plaintiff and others similarly situated, to sign agreements purporting to label them as "independent contractors," rather than employees.

61.     A true and correct copy of one such independent contractor agreement ("Agreement") used by Defendants is attached hereto as Exhibit C.

62.     Defendants' agreements, however, did not mirror the economic realities of the relationship that existed between Defendants and Drivers.

63.     The Agreement states that the Driver "is not an employee, agent, or servant" of Defendants.  Exhibit C.

64.     In reality, Defendants' policies and practices created an exclusive relationship between Drivers and Defendants, under which Drivers were economically dependent on Defendants' actions.

65.    For example, Defendants required each Driver to hold a permit that was affiliated exclusively with one of Defendants' CPNC's.

66.    Defendants also required each Driver to hold a permit that was affiliated exclusively with either Rapid Taxi or Yellow Cab as the Driver's sole licensed taxicab company.

67.    Without permits affiliated solely with Defendants and Defendants' CPNC's, Drivers could not drive cabs for Defendants.

68.    In order to maintain affiliation with Defendants, Drivers were required to pay an affiliation fee of approximately $375.00 per week if the Driver leased the vehicle from Defendants, or alternatively, a fee of approximately one-half of the lease fee if the Driver owned the vehicle.

69.    On a weekly basis, Defendants retained the right to refuse to continue the affiliation.

70.    Defendants' CPNC's were freely transferable, and therefore, Defendants could lease or sell their CPNC's at will.

71.    In contrast, Drivers' permits were not freely transferable.

72.    If Defendants refused affiliation, Drivers could not operate their cabs as vehicles for hire in the City of Atlanta without first obtaining the affiliation of another company and CPNC holder, as well as a new permit reflecting the change.

73.     This was so even if Drivers owned their own cabs.

74.     The Agreement also states, "Driver has the authority to establish the times of work, the method and completion of work, and all other incidents of how the Driver wishes to perform the task of driving a taxi cab . . . ." Exhibit C.

75.     In reality, Defendants forced Drivers to comply with policies and practices that controlled the means, methods, and other incidents of performing the task of driving a vehicle for hire.

76.     At all relevant times, Defendants exerted such control by requiring Drivers to comply with advertising policies.

77.     For example, Defendants designed the logos and other advertising materials displayed uniformly across Defendants' fleet.

78.     Defendants required each Driver to display Defendants' advertising materials on the exterior of the Driver's cab, regardless of whether the Driver owned the own cab or leased the cab from Defendants.

79.     Defendants required Drivers to pay for the installation of any such advertising.

80.     Defendants required Drivers' cabs to be painted white, if driven on behalf of Rapid Taxi, or yellow, if driven on behalf of Yellow Cab.

81.    Drivers were not allowed to use business cards with their names printed on the cards.

82.    At all relevant times, Defendants exerted control over Drivers by requiring Drivers to comply with policies and practices regarding the dispatch of fares to Drivers by Defendants.

83.    Defendants' dispatch system restricted Drivers' authority to determine means and methods of performing their work.

84.    For example, Defendants required Drivers to use Defendants as Drivers' exclusive dispatcher.

85.    Defendants also required Drivers to use onboard computers and radios owned by Defendants.

86.    Defendants' dispatch process began when the dispatcher would receive a call, at which time the dispatcher would identify the "zone" in which the fare was located.

87.    If a Driver were first in line in a particular zone when a fare was dispatched, the Driver's computer would display certain information about the fare that the Driver could use to determine whether to accept or reject the fare.

88.    Once a Driver entered his acceptance into the computer, the Driver was required to take the fare.

89.    If the Driver accepted, then later refused, the Driver's computer would be deactivated.

90.    Defendants routinely withheld certain material information that Drivers needed in order to use their discretion as to whether to they should accept or reject a fare.

91.    By way of example, Defendants had a practice of accepting payment by voucher from certain customers.

92.    When a customer paid by voucher, Drivers could not collect the fare until Defendants released payment, which could take several weeks.

93.    Because Drivers paid their affiliation fees weekly, such a delay in payment was of material relevance to them when deciding whether to accept a fare.

94.    Nevertheless, refusal of a fare paid by voucher would result in deactivation from the dispatch system, regardless of whether the voucher was disclosed to the Driver at the time of dispatch.

95.    On several occasions, Named Plaintiff refused to take dispatches he had previously accepted after learning that the fares were to be paid by voucher.

96.    As a result of Named Plaintiff's actions, Defendants deactivated his computer on each day that he refused a fare paid by voucher.

97.    Defendants did so despite the fact they had failed to disclose material information that they knew would affect Named Plaintiff's decision to take the fare.

98.    Similarly, Defendants withheld material customer data, including contact and destination information.

99.    The dispatcher's failure to collect or distribute sufficient information about a customer created substantial risks for Drivers, such as exposure to customer complaints if the fare could not be located and exposure to dangerous destinations or conditions.

100.   Drivers were forced to decide whether to accept or reject a fare before they were able to learn whether the dispatcher could or would provide such material information.

101.   Nevertheless, refusal of a fare after an initial acceptance resulted in deactivation from the dispatch system for the remainder of the workday, regardless of whether critical customer data was provided.

102.   In certain circumstances, Defendants set, negotiated, and manipulated the fares that Drivers were required to charge.

103.   For example, Defendants negotiated flat fares with customers on occasion.

104.   Such an arrangement was not disclosed to Drivers prior to dispatch.

105.   Under this fare arrangement, Drivers would not be entitled to compensation for time spent waiting on the customer before the trip began.

106.   Under a normal, metered arrangement, Drivers were paid for this so-called "waiting-time."

107.   Under Defendants' policies and practices, Drivers were forced to accept dispatches subject to flat fare arrangements, which resulted in Drivers receiving no compensation for waiting time.

108.   Refusal to honor a flat fare arrangement could result in removal from the dispatch system, and therefore, the inability to earn income for the remainder of the workday.

109.   By way of further example, Drivers' earnings were subject to a deduction by as much as ten (10) percent if a customer paid by credit card.

110.   Acceptance of the credit card deduction was a condition of employment.

111.   Refusal to accept credit cards would result in termination from employment and loss of affiliation.

112.   Through the policies and practices described in Paragraphs 82 - 111, Defendants directly restricted Drivers' ability to control the means and methods by which they earned income.

113.   Defendants also required each Driver to purchase insurance, regardless of whether the Driver owned the cab or leased the cab from Defendants.

114.   Defendants only allowed Drivers to purchase insurance from Captive Insurance.

115.   At all relevant times, Defendant Bekele owned Captive Insurance.

116.   At certain times during Named Plaintiff's employment, Rapid Taxi even required its Drivers to put Defendant Bekele's name on the titles of their cars as an owner of the vehicles.

117.   Defendants required Drivers to submit Motor Vehicle Reports (accident reports) to Captive Insurance.

118.   The premiums paid to Captive Insurance were deducted from the fee paid by Defendants' Drivers for their affiliation with company.

119.   The policies held by Captive did not disclose any deductibles to Drivers.

120.   Nevertheless, Defendants, at their discretion, could demand that Drivers pay out of pocket if the damage caused to a vehicle not owned or operated as part of Defendants' fleet cost less than $2,000.00 to repair.

121.   If Drivers failed to pay this discretionary deductible, Defendants could terminate the affiliation or refuse to insure their cars.

122.   On one occasion, Named Plaintiff was involved in an accident with another vehicle.

123.   The total repair cost to the other vehicle was less than $2,000.00.

124.   Named Plaintiff was instructed that, if he did not pay personally for the damage to the other vehicle, then he would not be given insurance for his own car through Captive Insurance.

125.   Defendants did not allow Drivers to operate cars that were not insured.

126.   Defendants required Drivers to pass regular inspections conducted by Defendants.

127.   Passage of Defendants' inspections was a requirement of Drivers' employment.

128.   Defendants' investment in the operation of its vehicles for hire was many times greater than the investments of their Drivers.

129.   For example, in order to become a company licensed to operate vehicles for hire in Atlanta, a company must own at least twenty-five CPNC's.

130.   On information and belief, the market value of a single CPNC averaged approximately $30,000.00 to $40,000.00 during all relevant times.

131.   In contrast, many Drivers did not own their cabs.

132.   Even Drivers who owned their cabs did not have an investment in their work that would be indicative of independent contractor status when compared with Defendants' investments.

133.   The affiliation fees paid by Drivers did not create any ownership interest in the vehicles or CPNC's.

134.   Therefore, Drivers who used their own vehicles for work have some financial investment in their work, but this amount was less than Defendants' investments in vehicles, dispatch systems, computers, GPS technology, employees, offices, and other assets.

135.   At all relevant times, Defendants exercised a substantial degree of control over Drivers' opportunity for profit or loss.

136.   In large part, the disparity in relative opportunity for profit or loss was driven by the comparative values of the related licenses.

137.   By way of example, if Defendants terminated a Driver from employment, the Driver could not use the Driver's permit to earn income operating a vehicle for hire, even if the Driver owned the vehicle.

138.   A Driver's permit and/or title to a vehicle are of no value without affiliation.

139.   The decision to sell or lease the CPNC or company, however, is always within the control of the holder or owner, and is never subject to the control of the Driver.

140.   Moreover, Drivers terminated from employment would be forced to locate another company with a CPNC available for lease or sale, enter into an affiliation, and receive a new permit, and only then be able to earn income operating a vehicle for hire.

141.   Therefore, the ability to generate profit from the operation of a vehicle for hire was substantially in the control of the CPNC holder and company affiliate.

142.   Moreover, Defendants were regularly able to eliminate a Driver's opportunity for profit simply by deactivating the computer systems used by Drivers to receive dispatched fares.

143.   On occasions when Defendants chose not to dispatch fares to Drivers, they could not receive dispatched fares through other licensed companies.

144.   Because many fares came through the dispatch systems of licensed companies, Defendants' refusal to dispatch fares would eliminate certain opportunities for Drivers to make a profit driving vehicles for hire.

145.   Therefore, Defendants maintained a high degree of control over Drivers' opportunity for profit and loss.

146.   The work of operating a vehicle for hire does not require any advanced skill or initiative.

147.   Obtaining a permit to drive a vehicle for hire in Atlanta requires submitting an application to the Bureau.

148.   Applicants must have completed a driving course in order to be considered for a permit.

149.   In order to maintain their permits, and therefore their affiliations, Drivers were required attend an annual class called the Atlanta Ambassador For-Hire Driver Training Course.

150.   Drivers were provided with a manual for the course, called the Atlanta Ambassador For-Hire Driver Training Manual, which included a syllabus and documents summarizing the obligations of permitted cab drivers.

151.   A true and correct copy of a selection of pages from the Atlanta Ambassador For-Hire Driver Training Manual, which summarize the obligations of an operator of a vehicle for hire, is attached to this complaint as Exhibit D.

152.   The requirements as listed in Exhibit D include tasks such as "maintain a daily Trip Sheet," "wear proper dress," and "[n]ot smoke or play loud music."

153.   Satisfying such requirements does not require any particular degree of skill.

154.   Due to the potential financial impact of separating a Driver's permit from a licensed company and CPNC, Drivers typically maintained extended employment relationships with Defendants.

155.   Drivers were incentivized to maintain employment with the holder of their affiliated CPNC.

156.   For example, the cost of separating from a company and CPNC holder is that a Driver cannot work until another affiliation is established.

157.   Therefore, Defendants maintained extended employment relationships with many Drivers.

158.   Named Plaintiff was a Driver for Rapid Taxi for over fifteen years.

159.   Named Plaintiff did not perform seasonal, temporary, or project-based work for Defendants.

160.   Others similarly situated also had lasting relationships with Defendants.

161.   Others similarly situated also did not do seasonal, temporary, or project-based work for the company.

162.   At all relevant times, Drivers' work was integral to the Defendants' business operations.

163.   Yellow Cab's Articles of Incorporation list the purposes of the business, which include, "engag[ing] in the business of providing taxi cab service."

164.   A true and correct copy of Yellow Cab's Articles of Incorporation is attached to this complaint as Exhibit E.

165.   Defendants are in the business of providing transportation by means of taxis, SUVs, and other vehicles.

166.   Drivers' jobs are, therefore, integral to Defendants' business.

167.   Consequently, and in spite of whatever labels Defendants applied to them, Named Plaintiff and others similarly situated were employees under the FLSA and not independent contractors.

## COUNT ONE

### DEFENDANTS' WILLFUL FAILURE TO PAY NAMED PLAINTIFF AND OTHER SIMILARLY SITUATED THE MINIMUM WAGE

168.   Named Plaintiff started work as a Driver for Defendants in 1986, and continued working in that capacity until February 19, 2012.

169.   Named Plaintiff and others similarly situated performed thousands of hours of work for Defendants over the three years prior to the filing of this complaint.

170.   Named Plaintiff and others similarly situated received no compensation for this work from Defendants.

171.   At all relevant times, Rapid Taxi was a covered enterprise under the FLSA.

172.   At all relevant times, Yellow Cab was a covered enterprise under the FLSA.

173.   Defendants Rapid Taxi, Yellow Cab, Solomon Bekele, and Jorgo Lemma are joint employers for the purposes of the FLSA.

174.   As joint employers, Defendants' enterprise is a covered enterprise under the FLSA.

175.   As Drivers, Named Plaintiff and others similarly situated were, at all relevant times, employees rather than independent contractors under the FLSA.

176.  Defendants controlled the conditions of Drivers' employment and the methods of their work.

177.  Defendants' investments in their business far exceeded the investment made by any Driver.

178.  Defendants directly controlled Drivers' opportunity for profit or loss.

179.  Driving a taxi is not an occupation that requires a high level of skill or initiative.

180.  Drivers, including Named Plaintiff, maintained extended employment relationships with Defendants.

181.  Drivers performed jobs that were integral to Defendants' business of providing transportation by taxicab.

182.  In spite of whatever labels Defendants have applied to them, Named Plaintiff and others similarly situated are employees under the FLSA.

183.  Therefore, Named Plaintiff and others similarly situated are not exempt from the FLSA's minimum wage provisions as independent contractors.

184.  Defendants were required to pay Named Plaintiff and others similarly situated the minimum wage pursuant to 29 U.S.C. § 206(a).

185.  Defendants violated the FLSA by failing to maintain accurate time records for Named Plaintiff and others similarly situated.

186.   Defendants' attempt to evade paying the minimum wage by labeling Named Plaintiff and others similarly situated as "independent contractors" was without legal basis.

187.   Defendants' attempt to evade paying the minimum wage by labeling Named Plaintiff and others similarly situated "independent contractors" was a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

188.   Pursuant to 29 U.S.C. § 216(b), Defendants are jointly and severally liable to Named Plaintiff and others similarly situated for three years of unpaid minimum wages, an equal amount as liquidated damages, and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiff and others similarly situated respectfully pray that:

– The Court certify this action as a collective action pursuant to the FLSA;

– The Court enter judgment in favor of Named Plaintiff and others similarly situated who opt into this action;

– The Court enter judgment against Defendants that their violations of the FLSA were willful;

–   The Court award all unpaid wages owed to Named Plaintiff and others similarly situated who opt into this action;

–   The Court award liquidated damages in an amount equal to the amount of all unpaid wages to Named Plaintiff and others similarly situated who opt into this action;

–   The Court award Named Plaintiff and others similarly situated who opt into this action the attorneys' fees and litigation costs incurred in prosecuting these claims as provided for under the FLSA; and

–   The Court grant the Named Plaintiff and all other others similarly situated who opt into this action all other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Named Plaintiff Charles Okpokwu, on behalf of himself and others similarly situated, demands a trial by jury.

Respectfully submitted:   June 29, 2012.

|  | s/John L. Mays |
|---|---|
| MAYS & KERR LLC | John L. Mays, Esq. |
| 229 Peachtree Street | Georgia Bar No. 986574 |
| International Tower \| Suite 980 |  |
| Atlanta, Georgia 30303 | s/Jeff Kerr |
| Telephone:  (404) 410-7998 | Jeff Kerr, Esq. |
| Facsimile:   (404) 855-4066 | Georgia Bar No. 634260 |
| john@maysandkerr.com |  |
| jeff@maysandkerr.com |  |

s/G. Blake Andrews
_____

Andrews & Stembridge, LLC                Gary Blaylock "Blake" Andrews, Jr.
1904 Monroe Drive, Suite 130             Georgia Bar No. 019375
Atlanta, GA 30324
Telephone:  770-828-6225
Facsimile:   866-828-6882
Blake@AndrewsStembridge.com              Attorneys for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 5.1(C), NDGa., the undersigned certify that the foregoing

**COMPLAINT** is typewritten using Times New Roman font, 14 point type.

Respectfully submitted:   June 29, 2012.

|  |  |
|---|---|
|  | s/John L. Mays |
| MAYS & KERR LLC | John L. Mays, Esq. |
| 229 Peachtree Street | Georgia Bar No. 986574 |
| International Tower | Suite 980 |  |
| Atlanta, Georgia 30303 | s/Jeff Kerr |
| Telephone:  (404) 410-7998 | Jeff Kerr, Esq. |
| Facsimile:   (404) 855-4066 | Georgia Bar No. 634260 |
| john@maysandkerr.com |  |
| jeff@maysandkerr.com |  |

s/G. Blake Andrews

Andrews & Stembridge, LLC          Gary Blaylock "Blake" Andrews, Jr.
1904 Monroe Drive, Suite 130       Georgia Bar No. 019375
Atlanta, GA 30324
Telephone:  770-828-6225
Facsimile:   866-828-6882
Blake@AndrewsStembridge.com        Attorneys for Plaintiff